**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JAMES C.,[1]

                               Plaintiff,                 6:19-cv-00544 (BKS)

v.

ANDREW SAUL, Commissioner of Social Security,

                               Defendant.

---

**Appearances:**

*For Plaintiff:*
Lawrence D. Hasseler
Conboy, McKay, Bachman & Kendall, LLP
307 State Street
Carthage, New York 13619

*For Defendant:*
Antionette T. Bacon
Acting United States Attorney
Kristina Cohn
Special Assistant United States Attorney
Social Security Administration
26 Federal Plaza
New York, New York 10278

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff James C. filed this action under 42 U.S.C. § 405(g) seeking review of a decision

by the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for

Social Security Disability Insurance ("SSDI") Benefits. (Dkt. No. 1). The parties' briefs, filed in

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect his privacy.

accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 12, 14). After carefully reviewing the Administrative Record,[2] (Dkt. No. 9), and considering the parties' arguments, the Court affirms the Commissioner's decision.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff applied for SSDI benefits on February 9, 2016, alleging that he had been disabled due to, inter alia, coronary artery disease and diabetes, since June 20, 2015. (R. 15, 187). The Commissioner denied Plaintiff's claim on April 16, 2016. (R. 15, 99–103). Plaintiff appealed that determination, and a hearing was held before Administrative Law Judge ("ALJ") Mary J. Leary on February 15, 2018, at which Plaintiff was represented by counsel. (R. 48–86). On May 22, 2018, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 15–25). Plaintiff filed a request for a review of that decision with the Appeals Council, which denied review on April 25, 2019. (R. 1–5). Plaintiff commenced this action on May 7, 2019. (Dkt. No. 1).

### B.    Plaintiff's Background and Testimony

Plaintiff was 63 years old at the time of the hearing in 2018. (R. 53). He is married with six adult children and resides with his wife. (R. 54). Plaintiff completed high school and college and went to graduate school. (R. 55–56). Plaintiff was a secondary education history teacher for more than 40 years. (R. 56). In addition to teaching, Plaintiff coached a number of sports and oversaw many groups, including mock trial and model United Nations competitions, and for ten years, "ran numerous summer youth camps." (R. 56–57). Plaintiff was a town justice for 14 years. (R. 57). He retired in June 2015. (R. 55).

---

[2] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 9), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

At the time he retired, Plaintiff was teaching "five full classes" of ninth graders in a high school with between 700 and 800 students and was president of the teacher's association. (R. 72–73). Plaintiff had a heart attack in 2000, (Dkt. No. 607), and during the last two or three years of his teaching career, Plaintiff had been sent home several times because "the nurse determined that [his] blood pressure was so high, they didn't want [him] there." (R. 73). "[S]ome of the times," when he was having chest pain and his blood pressure was high, he left school and went directly to the emergency room. (*Id.*). Additionally, Plaintiff was experiencing anxiety. (R. 74). Plaintiff's cardiologist and internist "mutually agreed it would be detrimental; possibly even catastrophic if [he] continued to work" because they believed he would suffer a massive heart attack or stroke. (R. 72). After his doctors cautioned that if he did not stop working he could die, he "resigned all [his] positions and stopped" working. (R. 74).

Plaintiff testified he typically starts his day "around 5:00/5:30 in the morning," takes the dog out, makes his wife's lunch, cleans the cat litter, and makes breakfast. (R. 60). Plaintiff reads during the day but requires "two or three different sets of prescription glasses" and does "a lot of the reading" on an iPad, where he can make the print larger. (R.60–61). Plaintiff watches television "once a week or so." (R. 61). Plaintiff talks on the phone "[h]ardly at all" and texts his children and wife. (R. 62). Plaintiff has no hobbies anymore. (*Id.*). Plaintiff occasionally goes to the movies or eats out with his wife. (R. 62–63).

Plaintiff is able to shower and dress himself. (R. 62). He cooks "on occasion." (R. 63). Plaintiff and his wife do the grocery shopping together. (*Id.*). Plaintiff does the dishes and takes out the garbage. (R. 64). Plaintiff "[o]ccasionally" mows the lawn using a riding lawnmower, but has hired "people to do most of the stuff outside" in the "last few years." (R. 65). Plaintiff has

"[o]n occasion" shoveled snow, but has "friends that help [him] out with that." (*Id.*). Plaintiff is able to drive and drove between 40 and 50 miles to the hearing. (R. 54–55).

Plaintiff stated he does not sleep "a lot" because he is "very uncomfortable." (R. 75). He states that "between all the bones [he's] broken over the years," and his knees and shoulders, which ache, he only sleeps "for a few hours" before getting up and moving around. (*Id.*).

Plaintiff has had cardiac issues since his "mid 30s," and has "[s]hortness of breath" and "angina chest pain." (R. 68). Plaintiff stated that he has "had difficulty" recently "with walking any length of time"; he gets "winded" and has "pain that radiates" to his jaw and left arm. (*Id.*). Plaintiff testified that his doctor has recommended that he exercise and he tries to "do as much as [he] can," and tries to walk in good weather. (*Id.*). He tries to get onto "a treadmill and walk for, at least, 30 minutes" every other day. (R. 69). He has also used a bike. (*Id.*).

Plaintiff began medication for diabetes "two or three years" before the hearing, and he has "to test five to six times a day . . . to see where [his] blood sugar is." (R. 74). Plaintiff experiences numbness in his feet and legs, and tingling in his hands. (*Id.*). Plaintiff stated that his "balance is questionable" because he has "lost a lot of the feeling in [his] feet." (R. 69). Plaintiff wears "heavy boots" for support, and has fallen down stairs at home and at school. (R. 74). He has "fallen off [his] roof several times"—the last time, he "broke five ribs." (R. 70). Plaintiff testified that he believes that the "falling's getting worse." (R. 75). Because of his "balance issues," Plaintiff's doctor wants him "to stay off ladders," to stay off the roof, to "[t]ake it real careful, if [he is] shoveling snow," [h]old onto something" when he takes the stairs. (R. 70–71). Plaintiff has a cane that he uses when the weather is bad, and "they suggested a walker," but Plaintiff was not interested. (R. 69).

Plaintiff testified that he has difficulty with his knees and that two orthopedic surgeons have recommended knee surgery, which Plaintiff has declined "until [he] just can't walk." (R. 71). Plaintiff has done physical therapy for his knees, but found it time and cost prohibitive. (*Id.*). Plaintiff has "continual fungal infections" in his feet, which he treats "with cream, on a daily basis." (R. 72).

Plaintiff follows a diabetic diet, has eliminated all junk food and snacks, and "eats three or four meals throughout the day" on a consistent schedule. (R. 67–68). Plaintiff does not take any pain medication. (R. 68). Plaintiff takes blood thinners as well as medication for prostate issues, diabetes, and anxiety, but no pain medication. (R. 66, 68). Plaintiff believes the medications have helped. (R. 67).

Plaintiff testified that he does not believe he can work, that he "couldn't stand anyplace" and when he sits down, he has "to get back up and move," and that it is [h]ard to concentrate. (R. 76).

C.    **Medical Evidence**

1.    **Family Doctor – Howard Meny, M.D.**

Plaintiff began seeing his family doctor, Howard Meny, M.D., in 1991 at age 37. (R. 420). The record contains approximately 90 patient visit notes from 1991 to 2017. (*See, e.g.*, R. 420, 630). Plaintiff informed Dr. Meny of his history of cardiac catheterizations and other "workup[s]" during his first visit, (R. 420), and first complained of chest pain at an August 22, 1994 office visit, at which point, Dr. Meny referred him for a stress test. (R. 419). A September 1, 1994 stress test for "[i]ntermittent chest pain" was negative. (R. 540).

A February 12, 1998 stress test was negative, (R. 548), but when Dr. Meny saw Plaintiff on February 20, 1998, Plaintiff complained of occasional chest heaviness. (R. 417). On August

21, 1998, Dr. Meny noted Plaintiff was doing well, that he "had no further significant chest pressure." (R. 423).

On October 25, 1999, Dr. Meny noted Plaintiff had been admitted to the hospital "with chest pain, [heart attack] was ruled out."[3] (R. 425). Dr. Meny prescribed Paxil and continued Xanax. (*Id.*). Plaintiff's blood pressure was under "good control" as of December 2, 1999. (R. 424). On March 25, 1999, Plaintiff had a stress test; it was negative. (R. 522).  In a note dated November 10, 2000, Dr. Meny observed Plaintiff was "tired a lot," and was experiencing "chest tightness," which went away with Zantac. (R. 426).

An April 4, 2001 chest x-ray for "chest pain" revealed "no acute cardiopulmonary disease" and "no significant changes in the appearance of the chest." (R. 513). Plaintiff had a physical on April 30, 2001, and Dr. Meny noted Plaintiff recently had a "normal [catheterization] [a]fter being admitted [to the hospital] w/ chest pain." (R. 427). Dr. Meny noted Plaintiff "had some problems w/edema in his legs," for which he prescribed knee high stockings. (*Id.*). Plaintiff saw Dr. Meny on August 24, 2001, and noted he was "doing well" and that he had sleep apnea, for which he was using a c-pap machine at night. (R. 412).

On June 20, 2003, Plaintiff reported chest pain with radiation into his left arm that "lasted into the night and then went away." (R. 430). Dr. Meny referred Plaintiff for a stress test and prescribed nitroglycerine. (*Id.*). A June 25, 2003, stress test was negative. (R. 565). Plaintiff also underwent a nuclear perfusion scan on June 25, 2003, which was normal, "with no evidence of ischemia or infarct." (R. 569). On December 9, 2003, Dr. Meny noted that Plaintiff was doing

---

[3] On October 19, 1999, Plaintiff was admitted to the hospital with chest pressure. (R. 517). Plaintiff underwent a stress test, during which Plaintiff experienced "mild chest pressure." (R. 517). The stress test was negative. (R. 517).

well, that his blood pressure was "good," though "high this morning," and that "he had a normal nuclear stress test 6 months ago." (R. 431).

On September 15, 2004, Plaintiff reported occasional chest pain; his blood pressure was good. (R. 440). An October 18, 2004, stress test report was "[n]egative . . . by EKG criteria." (R. 489). A nuclear scan report dated the same day concluded: "Normal perfusion of the left ventricle at rest and s tress with no evidence of ischemia or infarct. Normal left ventricular systolic function." (R. 490).

Plaintiff saw Dr. Meny on February 14, 2005, "with a headache and chest pressure." (R. 442). His blood pressure was elevated but his EKG was unchanged. (*Id.*). Dr. Meny instructed Plaintiff "to stay home for a couple of days" and noted he was "burning the candle at both ends and needs to cut back." (R. 442).

On September 21, 2005, Dr. Meny reviewed Plaintiff's catheterization report[4] and prescribed folate, B12, and fish oil "for his coronary arteries." (R. 400). On December 30, 2005, Plaintiff was doing well and his blood pressure was "acceptable." (R. 439).

On April 4, 2007, Dr. Meny noted Plaintiff was "feeling fine" and his blood pressure was under control. (R. 403). Plaintiff reported "chest pain" "with some achiness in the left arm." (*Id.*). Dr. Meny prescribed nitroglycerin and considered a cardiac referral for a stress test. (*Id.*). The in-office EKG indicated "no acute changes." (*Id.*).

Dr. Meny saw Plaintiff on April 27, 2007, after his catheterization, which was "unchanged from two years ago," and noted that Plaintiff has "occasional pains" and referred him for an upper endoscopy. (R. 436).

---

[4] Plaintiff was admitted to the hospital on August 10, 2005, with chest pain. (R. 554).

On June 3, 2009, Dr. Meny referred Plaintiff for a stress test after he reported experiencing chest pain. (R. 473). During the June 26, 2009 stress test for "exercise-induced chest pain," Plaintiff "had a hypertensive response to exercise with a peak blood pressure of 190/86," and "some PVCs at rest" were noted. (R. 368). At "maximum exercise," Plaintiff developed "some chest lightness with some right arm tightness." (*Id.*). The final impression noted was: "Negative stress test by EKG criteria, some chest discomfort at maximum heart rate." (*Id.*). Plaintiff underwent a nuclear cardiac stress test the same day. (R. 369). The report indicated "normal perfusion of all myocardial segments" and "normal myocardial wall motion." (*Id.*).

On February 25, 2010, Plaintiff reported to Dr. Meny that he was experiencing joint pain and stiffness in his left ankle. (R. 455). Plaintiff went to a "recheck" with Dr. Meny on June 16, 2010 and August 18, 2010 and reported no complaints other than anxiety. (R. 450–53). On November 19, 2010, Plaintiff saw Dr. Meny for "a 6 month checkup" and reported anxiety and chest tightness and pain. (R. 448).

Plaintiff saw Dr. Meny on June 13, 2012, for "hypertension follow-up," and reported chest pain and anxiety. (R. 303). Plaintiff saw Dr. Meny on October 3, 2012, complaining of "feeling sluggish with legs swelling," that he was "having trouble taking w[eigh]t off," that his blood pressure had "been running high throughout summer" and that he "had some chest pain at various times." (R. 307). Plaintiff also reported joint stiffness and anxiety. (*Id.*). Plaintiff saw Dr. Meny on December 12, 2012, for "hypertension follow-up" and reported "chest pain lasting 1–15 minutes" and "radiating to the arms" but that it was "relieved by rest" and that he had dizziness and vertigo. (R. 316).

Plaintiff saw Dr. Meny on March 13, 2013, and noted that he occasionally had chest pain "associated with anxiety" but that it was "not persistent." (R. 320–22). Dr. Meny observed that this was "somewhat atypical of true angina." (R. 322). On June 5, 2013, Plaintiff saw Dr. Meny for a "hypertension follow-up" and complained of chest pain and anxiety. (R. 268). Dr. Meny noted that Plaintiff had no palpitations, that "the heart rate was not fast," and "no dizziness" and that he "has had cardiac referral." (R. 268–70). According to Dr. Meny's patient visit note from September 9, 2013, Plaintiff reported that he had been working on losing weight and that he was experiencing anxiety. (R. 327).

Plaintiff saw Dr. Meny on March 21, 2014, for "hypertension follow-up" and reported that his left ankle had been "sore off and on" and that it "[s]tiffens up a lot." (R. 335). Plaintiff also indicated he was having chest pain that seemed "to be brought on by stress." (*Id.*). Dr. Meny diagnosed "[t]endonitis of the left Achilles tendon." (R. 338).

On June 6, 2015, Plaintiff saw Dr. Meny and reported that he was having "anxiety now end of year trying to decide if he should retire chest tight from anxiety he feels." (R. 353). He also reported that his blood pressure had been high—it was 140/90 during his visit with Dr. Meny. (R. 354). Dr. Meny observed Plaintiff "would have less stress if he did retire" and that retirement "would help his blood pressure and his overall health. (*Id.*). Plaintiff saw Dr. Meny on September 16, 2015 for "hypertension follow-up" and he reported that he was "[d]oing well." (R. 356). His blood pressure was 146/86. (R. 358). On December 16, 2015, Plaintiff saw Dr. Meny for "[d]iabetes new onset." (R. 361). Plaintiff also asked Dr. Meny to check his left shoulder and he had pain after lifting heavy pieces of wood. (*Id.*). Under "Assessment," Dr. Meny listed coronary artery disease, hypertension, esophageal reflux, hyperlipidemia, and "[t]ype 2 diabetes mellitus without complication." (R. 365).

On May 17, 2017,[5] Plaintiff saw Dr. Meny for diabetes follow up and reported sleep disturbance and anxiety. (R. 636). Dr. Meny noted that Plaintiff had "[g]ood exercise habits and exercising regularly," that he had "a recent increase in physical activity and [was] moderately exercising 3+ times a week." (R. 638). Dr. Meny observed Plaintiff's strength, balance, gait, and stance were "[n]ormal." (R. 639). A patient visit note from September 20, 2017, indicates that Plaintiff saw Dr. Meny for diabetes, a Department of Transportation ("DOT") physical, and because his toes felt "weird" and fingers were "tingl[ing]." (R. 630). Dr. Meny noted Plaintiff had "[n]o musculoskeletal symptoms" and that "[o]verall findings were normal, as were Plaintiff's balance, gait, and stance, and that there were [n]o cardiovascular symptoms." (R. 632–34).

## 2.     Hospitalizations and Cardiological Care Before 2013

Plaintiff was admitted to the hospital on August 10, 2005, with chest pain. (R. 554). Dr. Brian Gaffney, M.D., diagnosed acute coronary syndrome and ordered a repeat cardiac catheterization. (R. 563–64). An August 10, 2005 chest x-ray revealed no "evidence of acute cardiopulmonary disease" but that the "[t]horacic aorta is calcified and tortuous" there was "mild degenerative change in the thoracic spine." (R. 562). On August 11, 2005, Plaintiff underwent left heart catheterization, which revealed that the "L[eft] A[nterior] D[escending artery] has 30% mid-segment disease." (R. 560). Cardiologist Ramzi Nassif, M.D. wrote that the catheterization revealed "no hemodynamically significant coronary artery disease with normal left ventriculogram" and advised that Plaintiff "would be best served by continuing medical therapy." (R. 496).

---

[5] There are no treatment notes from Dr. Meny from 2016.

On April 16, 2007, Plaintiff had a cardiological consultation with cardiologist Alessandro Giambartolomei, M.D. (R. 482). Dr. Giambartolomei noted Plaintiff's "long standing history of ischemic heart disease" and chest pains, and that in "the past 17 years [Plaintiff] has had three cardiac catheterizations done," the most recent of which showed "minimal coronary artery diseases with 30% stenosis" and "plaques in the circumflex and right coronary artery." (*Id.*). Plaintiff reported that he had noticed in recent weeks "recurrence of left arm pain at rest and on exertion," which was relieved by "complete rest" or nitroglycerin. (*Id.*). On physical examination, Dr. Giambartolomei noted "[c]ardiac exam reveals increased S2" and "1+bilateral edema" but otherwise normal findings. (R. 483). Dr. Giambartolomei assessed probable "recurrent angina in patient with mild previously proven mild coronary artery disease, and positive stress test," prescribed a statin, and planned to schedule Plaintiff for a cardiac catheterization and possible angioplasty. (*Id.*).

On April 25, 2007, Plaintiff underwent a left heart catheterization. (R. 262). Dr. Giambartolomei observed that Plaintiff had "[m]inimal coronary artery disease which has not progressed over the past few years and normal left ventricular function in patient with symptoms of chest pain, questionable positive nuclear stress test." (*Id.*). "In view of these findings," Dr. Giambartolomei "believe[d] that the patient's symptoms are not related to myocardial ischemia." (*Id.*).

On June 26, 2009, Plaintiff had a stress test for "exercise-induced chest pain." (R. 368). Plaintiff "had a hypertensive response to exercise with a peak blood pressure of 190/86." (*Id.*). "[S]ome PVCs at rest" were noted. (R. 368). At "maximum exercise," Plaintiff developed "some chest lightness with some right arm tightness." (*Id.*). The final impression noted was: "Negative stress test by EKG criteria, some chest discomfort at maximum heart rate."( *Id.*). Plaintiff

underwent a nuclear cardiac stress test the same day. (R. 369). The report indicated "normal perfusion of all myocardial segments" and "normal myocardial wall motion." (*Id.*).

**3.     Cardiologist Hooman Ranjbaran-Jahromi, M.D.**

On June 24, 2013, Plaintiff saw cardiologist Hooman Ranjbaran-Jahromi, M.D. (R. 382). Plaintiff reported having "dyspnea on exertion and chest pressure with activity [f]or the past two months." (*Id.*). The physical examination was largely normal. (R. 383). Dr. Ranjbaran-Jahromi noted concern that Plaintiff's stenosis, which was 30% per the previous cardiac catheterization, "is significant now," and recommended a treadmill nuclear stress test. (R. 384).

On July 5, 2013, Hooman Ranjbaran-Jahromi, M.D. saw Plaintiff for follow up of his stress test. (R. 275). Plaintiff denied chest pain but reported "shortness of breath with activities." (*Id.*). On "review of symptoms," Dr. Ranjbaran-Jahromi noted "positive chest pain and pressure" and "positive shortness of breath." (R. 276). Blood pressure was 132/82 and pulse was 84. (*Id.*). On cardiac examination, Dr. Ranjbaran-Jahromi found "increased S2. No S3 or S4. No gallop, cluck, murmur or rub." (R. 386).  The July 2, 2013 stress test revealed "[r]educed aerobic capacity with hypertensive hemodynamic response." (R. 276, 380–81). There was "[n]o EKG evidence of inducible ischemia" but Plaintiff had "chest pain with exertion." (R. 276). There was no evidence of "ischemia or infarction." (R. 277). Dr. Ranjbaran-Jahromi observed that Plaintiff's "hyperlipidemia is borderline controlled," "triglycerides are still high" and instructed Plaintiff on a "healthy diet and daily exercise" and recommended continuing "the Lipitor 20 for now." (*Id.*).

Dr. Ranjbaran-Jahromi saw Plaintiff on July 1, 2014. (R. 278). Plaintiff reported continued "chest pressure mainly with mental stress" but denied other cardiac complaints. (*Id.*). Plaintiff's blood pressure was 148/82 and Dr. Ranjbaran-Jahromi found "increased S2" and "1+

bilateral edema" but no "gallop, click, murmur or rub." (R. 279). Plaintiff's "triglycerides were too elevated at 306" and that "limit[ed] the assessment of LDL." (*Id.*).

Plaintiff had a stress echocardiogram on July 24, 2014. (R. 281). The "test was stopped because of chest pain and fatigue" but the "level of exercise represent[ed] a fair exercise tolerance for age." (R. 281). In addition, the test revealed "mild concentric left ventricular hypertrophy," that the "diastolic filling patter indicate[d] impaired relaxation," but no "evidence of inducible ischemia." (*Id.*). Additionally, the echo images "acquired at peak stress which demonstrated appropriate augmentation of all left ventricular segments" and there "were normal blood pressure and heart rate responses to stress." (R. 282).

Plaintiff saw Dr. Ranjbaran-Jahromi on July 13, 2015 for assessment "of prior chest pressure that appears to be mainly due to stress." (R. 286). Plaintiff reported that he "retired last week" and that he was "starting to exercise on a routine basis, and lose weight." (*Id.*). Plaintiff's "symptoms [were] chronic and have not changed." (*Id.*). On physical examination, Dr. Ranjbaran-Jahromi noted Plaintiff's blood pressure was 122/66 and found "increased S2" and "1+ bilateral edema" but no "gallop, click, murmur or rub." (R. 287). Plaintiff's "HDL [was] still low." (*Id.*). Dr. Ranjbaran-Jahromi advised Plaintiff that it was "absolutely necessary for him to lose a minimum of 50–100 pounds." (*Id.*). Dr. Ranjbaran-Jahromi advised that he would "see him in a year followup with a stress echo." (R. 663).

Plaintiff saw Dr. Ranjbaran-Jahromi on August 16, 2016, and reported that he continued to have chest pain with exertion. (R. 656). A "stress echo today . . . showed reproduction of the chest pain, but no evidence of ischemia." (*Id.*). Dr. Ranjbaran-Jahromi wrote that there was "no evidence of ischemia on nuclear stress test." (R. 658). Dr. Ranjbaran-Jahromi noted that Plaintiff had stopped working, that his mental stress "has been declining," that he had lost weight, that he

was on a stricter diet, that his "last LDL was 46, which is outstanding," and that "[h]is hypertension is well controlled as well." (*Id.*). On examination, Dr. Ranjbaran-Jahromi found "increased S2" and "trace bilateral edema" but no "gallop, click, murmur or rub." (R. 657). Ranjbaran-Jahromi observed that: "At this point, patient shows an outstanding change in his profile compared to last year which can be explained by losing weight and minimizing mental stress. It appears that his job was a major factor for his mental stress and his profile is improving." (R. 658).

Plaintiff saw Dr. Ranjbaran-Jahromi on November 29, 2017, and reported "having chest pain with radiation to the left arm for the past month." (R. 653). On physical examination, Dr. Ranjbara-Jahromi noted "[h]eart reveals S1/S2," "PMI nondisplaced, no murmur, click, rub or gallop." (R. 654). "In light of risk factors and new onset of chest pain," Dr. Ranjbaran-Jahromi suggested a nuclear stress test. (*Id.*).

Plaintiff saw Dr. Ranjbaran-Jahromi on January 4, 2018 for follow-up of a nuclear stress test. (R. 648). Dr. Ranjbaran-Jahromi noted that Plaintiff "developed angina and was found to have mild apical ischemia." (*Id.*). Plaintiff had "chest pressure with radiation to left arm." (*Id.*). On physical examination, Dr. Ranjbara-Jahromi noted "[h]eart reveals S1/S2," "PMI nondisplaced, no murmur, click, rub or gallop." (R. 649). The January 4, 2018 stress test revealed "[n]onischemic EKG response to exercise"—"[h]e developed angina," "[m]ild abnormal nuclear stress images with evidence of mild, small apical ischemia," and "[n]ormal LVEF of 63% with normal wall motion and thickening throughout the left ventricle." (R. 652). On January 9, 2018, Plaintiff had a cardiac catheterization, which revealed: LAD 20–30% long mid vessel disease, [Left Circumflex Artery] 20% mid disease, R[ight] C[oronary] A[rtery] dominant with 20% proximal and distal disease, and E[jection] F[raction] 55–60%. (R. 680–81).

Mild coronary artery disease was diagnosed and the "[p]lan was to "[c]ontinue medical therapy including statin and metroprolol. (R. 680–81).

### 4.   Podiatrist Mark Schug

On June 20, 2017, Mark Schug, DPM, a podiatrist, saw Plaintiff for nail fungus and reported some "numbness of the foot." (R. 642). Dr. Schug found "adequate sensation" in the toes of both feet. (*Id.*). On August 22, 2017, Dr. Schug noted that "there is absent sensation at the distal aspect of the toes" but "normal sensation on the planter aspect surface of both feet," and that Plaintiff's symptoms were suggestive of diabetic neuropathy. (R. 646). Dr. Schug against found evidence of diabetic neuropathy in Plaintiff's feet on October 17, 2017. (R. 643). Dr. Schug saw Plaintiff on December 19, 2017, for foot care. (R. 645). Dr. Schug found "light touch discrimination is absent on the plantar surface of the toes . . . and across the plantar aspect of . . . both feet." (*Id.*). Plaintiff reported that he fell recently—losing his balance and injuring "his left great toenail." (*Id.*). In a letter dated January 8, 2018, Dr. Schug wrote that Plaintiff had "evidence of diabetic neuropathy," and that it "may result in numbness or reduced ability to feel pain and/or temperature changes" and may cause "loss of sensation in the lower extremities." (R. 644).

### D.   Opinion Evidence

### 1.   Consultative Internal Medical Examiner Brian Cole, M.D.

On March 31, 2016, Plaintiff saw Brian Cole, M.D., for a consultative internal medical examination. (R. 606). Plaintiff was 61 at the time of the exam. (*Id.*). Dr. Cole noted Plaintiff's chief complaints were hypertension, history of a heart attack, and partial blockages in his heart arteries since 1990. (*Id.*). Plaintiff reported that "he may need a coronary artery bypass graft." (*Id.*). Plaintiff also reported acid reflux and stomach ulcers, "angina since 1990" and "a little chest pain today," as well as joint deterioration "of his knees, hips, ankles, elbows, and hands."

(*Id.*). Plaintiff further reported anxiety and depression, insomnia since 2001, and vertigo since 2013. (*Id.*). Plaintiff indicated he has had diabetes since 2015, for which he is on metformin. (*Id.*). Dr. Cole noted that "his fingerstick is elevated at 190, which shows poor control." (*Id.*).

Regarding his activities of daily living, Plaintiff reported that showers and dresses daily. (R. 607). He cooks five times a week, cleans and does laundry two to three times a week, and shops one to two times a week. (*Id.*). He also reported that he "watches TV, reads, and walks." (*Id.*).

Dr. Cole observed that Plaintiff "appeared to be in no acute distress," that his gait was normal, he could walk without difficulty, that his stance was "normal," that he was able to rise from a chair "without difficulty" and needed no help changing for the exam or getting on and off the exam table. (R. 608). Dr. Cole noted that Plaintiff could "[s]quat full" but with "knee pain." (*Id.*). Dr. Cole also noted that Plaintiff's heart had "[r]egular rhythm," and "[n]o murmur, gallop, or rub" was audible, but that there was "PMI in left 5th intercostal space at midclavicular line." (*Id.*). The musculoskeletal exam was normal. (R. 608–09). Dr. Cole opined that Plaintiff had "[m]ild restrictions for squatting, kneeling, heavy lifting, and carrying" and that he was "restricted from activities requiring mild or greater exertion because of his cardiac problems and history of heart attack." (R. 609).

### 2.      Consultative Psychiatric Examiner – Cheryl Loomis, Ph.D.

Plaintiff underwent a consultative psychiatric evaluation on March 31, 2016 with Cheryl Loomis, Ph.D. (R. 613). Plaintiff provided his employment and medical history, including his cardiac problems. (*Id.*). Plaintiff reported that he has difficulty falling asleep and "wakes up three to four times a night due to pain and racing thoughts." (*Id.*). Plaintiff told Dr. Loomis that he "worries about his health and finances, and that he misses work. (R. 614). Dr. Loomis found Plaintiff "cooperative with adequate overall social skills," that his thought processes were

16

"[c]oherent and goal oriented," that his affect and mood were dysphoric and dysthymic, respectively, that he was well oriented, his attention and concentration as well as his memory skills were intact, his cognitive functioning "appeared to be average to above average" and his insight and judgment were good. (R. 614–15). Dr. Loomis opined that Plaintiff had "no limitation" in following directions, performing simple and complex tasks, maintaining attention, concentration, and a regular schedule, learning new tasks, making appropriate decisions, and relating with others. (R. 615). Dr. Loomis found Plaintiff, however, "evidence mild limitation in his ability to appropriately deal with stress." (*Id.*).

### 3.       State Agency Medical Consultant – S. Putcha, M.D.

On April 15, 2016, S. Putcha, M.D., after reviewing Plaintiff's medical records provided the following assessment:

> Possible coronary artery disease and some obstruction with angina
> . . . . Has diabetes and no endorgan [sic] damage. Geteralised [sic]
> arthralgia in legs but no instability or severe arthritis. Independent
> in A[ctivities of] D[aily] L[iving]. Normal gai [sic]. No restriction
> of joint motion in arms and legs and spine. Light work can be
> assigned.

(R. 91).

### 4.       Treating Physician – Howard Meny, M.D.

On March 24, 2017, Dr. Meny completed a medical source statement indicating that Plaintiff: can lift and carry up to 10 pounds frequently and 11 to 20 pounds occasionally; can, without interruption, sit for one hour, stand 20 minutes, and walk 30 minutes; and, in an 8-hour workday, can sit one hour, stand 30 minutes, and walk 30 minutes. (R. 623–24). Dr. Meny opined that Plaintiff can reach, handle, finger, feel, and "push/pull" occasionally, and use his feet to operate foot controls frequently. (R. 624–25). Regarding postural limitations, Dr. Meny opined that Plaintiff can occasionally climb stairs, balance, stoop, and crouch, but never climb

ladders, kneel, or couch, explaining that Plaintiff has "very little cartilage left in knees" per Dr. Ortega, and that he has pain in his "knees, back, hands + shoulders." (R. 625–26). Dr. Meny stated that Plaintiff would need to work in a "quiet place," and could never work at unprotected heights, but occasionally tolerate moving mechanical parts, operating a motor vehicle, humidity and wetness, and other environmental conditions. (R.626–27). Dr. Meny opined that Plaintiff can perform shopping, travel without a companion, ambulate without an assistive device, climb a few steps at a reasonable pace, prepare a simple meal, care for personal hygiene, and sort or use papers and files, but could not "walk a block at a reasonable pace on rough or uneven surfaces." (R. 627). In addition, Dr. Meny wrote a letter regarding Plaintiff and his care for him over the past 25 years. (R. 621–22). Dr. Meny outlined Plaintiff's conditions, "multiple episodes of chest pain," and numerous cardiac catheterizations. (R. 621). Dr. Meny explained that: "[t]o help him prevent the progression of his coronary artery disease and other medical problems, [Dr. Meny] recommended that he retire early" as his chest pain "was triggered by stress from these various jobs and in positions that he held." (*Id.*). Dr. Meny wrote that "[r]etirement has helped control" Plaintiff's chest pain. (*Id.*). Dr. Meny also wrote that Plaintiff has limited use of his left shoulder following surgery, and that even following surgery, Plaintiff's knee "continues to give him pain and limits his ability to ambulate without pain." (*Id.*). Dr. Meny observed that "[d]ue to pain in his lower back he can only sit for about an hour at a time before he needs to get up and move around." (R. 622). Dr. Meny stated that he does not recommend that Plaintiff return to any of his former jobs and that "in concert with his cardiologist have recommended that he no longer work." (*Id.*).

### 5.    Vocational Expert – Terri Crawford

Terri Crawford, a vocational expert, testified at the hearing before the ALJ. (R. 52). Crawford testified that a hypothetical individual with Plaintiff's past relevant work, who was

limited to light work, but "must never climb ladders, ropes or scaffolds," and "must avoid dangerous machinery and unprotected heights," could perform Plaintiff's past relevant work as a secondary teacher or as a justice—as defined in the DOT, but could not perform those jobs as Plaintiff described them at the hearing. (R. 79). Crawford testified that such an individual, whose concentration "was off for about five percent of the workday" could still, in her opinion, be a teacher, but not a justice. (R. 80). Crawford testified that a teacher falls in the light work category and a justice qualifies as sedentary work. (R. 81).

### E.    The ALJ's Opinion Denying Benefits

The ALJ issued a decision dated May 22, 2018, and determined that Plaintiff was not disabled under the Social Security Act. (R. 15–25). After finding, as an initial matter, that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2020, (R. 17), the ALJ used the required five-step evaluation process to reach his conclusion.[6]

At step one, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since the alleged disability onset date, June 20, 2015. (*Id.*). At step two, the ALJ determined that Plaintiff had the following severe impairments under 20 C.F.R. §§ 404.1520(c): coronary artery disease, tendonitis Achilles tendon, diabetes mellitus, and diabetic neuropathy. (*Id.*). As to Plaintiff's "medically determinable mental impairments of anxiety disorder not

---

[6] Under the five-step analysis for evaluating disability claims:

> [I]f the commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

otherwise specified, and adjustment disorder, the ALJ determined that they were nonsevere. (R. 19).[7]

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 20 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526)).[8]

The ALJ proceeded to determine Plaintiff's residual functional capacity ("RFC")[9] and found that Plaintiff had the RFC "to perform light work[10] as defined in 20 CFR 404.1567(b) and except he must never climb ladders, ropes or scaffolds; and must avoid concentrated exposure to hazards such as dangerous machinery and unprotected heights." (R. 20). In making this determination, the ALJ followed a two-step process "in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and then

---

[7] Plaintiff does not challenge the ALJ's finding at step 2 that his mental impairments were nonsevere.

[8] Plaintiff does not challenge the ALJ's finding at step 3 that his impairments do not meet or medically equal the severity of a listed impairment.

[9] The Regulations define residual functional capacity as "the most [a claimant] can still do despite" her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ must assess "the nature and extent of [a claimant's] physical limitations and then determine . . . residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The Regulations further state that "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id*.

[10] C.F.R. § 404.1567(b) provides:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

evaluated "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations." (*Id.*).

Applying this two-step process, the ALJ found that while the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," the "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*). The ALJ further explained that "the objective medical evidence of record does not support the level of pain, fatigue, and limitations alleged by the claimant." (R. 21). Addressing Plaintiff's coronary artery disease, the ALJ acknowledged that the "record shows a history of cardiac issues, with a heart attack in 2000, and subsequent cardiac treatment," but found that testing and examinations "failed to reveal significant cardiovascular findings," and were "not consistent with a debilitating cardiac condition." (*Id.*). In support of his conclusion, the ALJ observed that Plaintiff "has not required further significant surgical intervention for a cardiac impairment during the relevant time period." (*Id.*).

The ALJ also addressed Plaintiff's "tendonitis of Achilles tendon," but found "examinations have generally noted normal gait and stance; normal coordination; normal deep tendon reflexes; with no significant abnormalities." (*Id.*). As to Plaintiff's diabetes mellitus with neuropathy, the ALJ found that while the record "mentions peripheral neuropathy during the relevant period," "bilateral edema of the extremities," and "absent plantar sensation of the toes of both feet," findings on physical examinations were principally normal. (R. 22 (noting that the medical record mentions that "peripheral pulses [were] intact; no cyanosis or clubbing of the extremities; normal balance; normal gait and stance; no ankle edema; adequate sensation of bilateral feet . . . no severe vascular insufficiency in either foot; normal deep tendon reflexes")).

After concluding that the medical record did not support the level of limitation Plaintiff claimed, the ALJ considered the consistency of Plaintiff's activities with his alleged "debilitating conditions." (R. 22). The ALJ found Plaintiff's ability to cook five times a week, clean and do laundry two to three times a week, shop one to times a week, walk on a treadmill every other day for 30 minutes, shower and dress daily to be inconsistent with disabling limitations. (*Id.*). The ALJ also noted that Plaintiff cares for the animals in the house, drives, makes his wife's lunch, and that, on occasion, he eat outs and attends movies with his wife, mows the lawn, and shovels snow, and found these activities weighed against a finding that Plaintiff's pain, fatigue, and alleged limitations were as disabling as he asserted them to be. (*Id.*). Additionally, the ALJ observed that Plaintiff "received far less treatment than one would expect of someone experiencing pain and limitation of the severity he has reported." (*Id.*).

After considering the opinion evidence of record, the ALJ gave "[g]reat weight to the opinion of State Agency medical consultant, S. Putcha, M.D.," who opined Plaintiff could perform light work so long as he avoided machinery and heights, explaining that while Dr. Putcha did not "have the benefit of examining the claimant," not only did he "review[] the claimant's records, [and] provide[] a detailed explanation of his findings," but he "offered an opinion that is widely consistent with the overall record," including the cardiac examination findings. (R. 22–23). The ALJ gave "little weight" to the opinions of Dr. Cole, the consultative examiner, and Dr. Meny, who, he acknowledged, was Plaintiff's treating physician. (R. 23). The ALJ found Dr. Cole's opinion "vague as to the restriction of 'mild or greater exertion,'" and that "additional evidence of medical treatment" Plaintiff received after Dr. Cole's review, in fact, "supports a finding of *further* limitations in lifting and carrying than those opined by Dr. Cole." (R. 23 (emphasis added)). The ALJ adopted Dr. Meny's opinion to the extent he found Plaintiff

limited to "lifting and carrying 10 pounds frequently and 20 pounds occasionally and no work around unprotected heights," but she found "the remaining portions of the opinion are not supported by Dr. Meny's own treatment notes and examination findings," which, with some exceptions, generally revealed normal cardiac, musculoskeletal, and neurological findings. (R. 23). The ALJ found Dr. Meny's own treatment notes, which referenced Plaintiff's good exercise habits, and at one point indicated that Plaintiff had "no physical disability," to be inconsistent with "the extreme limitations as opined," such as "the ability to sit for only 1 hour, and stand and walk for only 30 minutes." (*Id.*).

At step four, having determined Plaintiff's RFC, relying on the testimony of the vocational expert, the ALJ determined that Plaintiff was capable of performing his past relevant work as a secondary school teacher and a justice "as generally performed in the national economy." (R. 24).

Thus, the ALJ concluded that Plaintiff has "not been under a disability, as defined in the Social Security Act, from June 20, 2015, through the date of this decision." (*Id*. (citing 20 C.F.R. § 404.1520(f)).

## III.   DISCUSSION

### A.   Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such *relevant* evidence as a *reasonable mind* might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir.

2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may reject the facts that the ALJ found "only if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The Court, however, must also determine whether the ALJ applied the correct legal standard. *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999). "'Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.'" *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir. 1984) (quoting *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)). The Court reviews de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles. *See id.*; *see also Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir. 1987).

**B.    Analysis**

Plaintiff argues that the Commissioner erred in in the following ways in denying his claim: (1) the Commissioner failed to properly evaluate Plaintiff's credibility and subjective complaints of disabling symptoms; and (2) the Commissioner failed to properly assess Plaintiff's RFC. (Dkt. No. 12, at 12–18).

**1.    Plaintiff's Subjective Complaints**

Plaintiff challenges the ALJ's evaluation of his credibility,[11] asserting that the ALJ failed to consider Plaintiff's long work history, erroneously concluded Plaintiff's allegations were inconsistent with the evidence in the record, and failed to consider the opinions of Drs.

---

[11] In SSR 16-3p, the Social Security Administration eliminated "the use of the term 'credibility' from [its] sub-regulatory policy," because its "regulations do not use this term" and in order to "clarify that subjective symptom evaluation is not an examination of an individual's character" and to "more closely follow [its] regulatory language regarding symptom evaluation." SSR 16-3p.

Ranjbaran-Jahromi and Schug. (Dkt. No. 12, at 12–15). "When assessing a claimant's credibility, the ALJ must consider both his medical records and his reported symptoms." *Pidkaminy v. Astrue*, 919 F. Supp. 2d 237, 248 (N.D.N.Y. 2013) (citing 20 C.F.R. § 404.1529). "A claimant's statements about his condition, on their own, are not enough to establish disability." *Id.* However, a claimant's statements of pain and limitation are entitled to great weight where they are supported by objective medical evidence. *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992). If a claimant's testimony is not supported by objective medical evidence, the ALJ employs a two-step process to evaluate the claimant's reported symptoms: (1) the ALJ determines if the claimant has medically determinable impairments that could produce the alleged symptoms; and (2) if the impairments do exist, the ALJ evaluates the intensity, persistence, and limiting effects of the symptoms to determine the extent to which the symptoms limit the claimant's ability to work. *See Pidkaminy*, 919 F. Supp. 2d at 249 (citing 20 C.F.R. § 404.1529(a)). In so doing, the ALJ considers the following:

1) the claimant's daily activities;

2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms;

3) precipitating and aggravating factors;

4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms;

5) other treatment the claimant receives or has received to relieve his pain or other symptoms; any measures the claimant takes or has taken to relieve his pain or other symptoms; and

6) any other factors concerning the claimant's functional limitations and restrictions due to his pain or other symptoms.

*Id.* (citing 20 C.F.R. § 416.929(c)(3)(i)-(vii)). "After considering the objective medical evidence, the claimant's demeanor and activities, subjective complaints, as well as any inconsistencies

between the medical evidence and the claimant's subjective complaints, an ALJ may accept or disregard the claimant's subjective testimony as to the degree of impairment." *Id*. "An ALJ who rejects the subjective testimony of a claimant must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." *Id.* (internal quotations and citation omitted). In general, courts "afford great deference to the ALJ's credibility finding, since the ALJ had the opportunity to observe [the claimant's] demeanor while [the claimant was] testifying." *Kessler v. Colvin*, 48 F. Supp. 3d 578, 595 (S.D.N.Y. 2014) (citation omitted).

Here, at step one of the two-step process, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. 21). At step two, the ALJ evaluated Plaintiff's statements concerning the "intensity, persistence, and limiting effects" of the symptoms alleged and found they were "not entirely consistent with the medical evidence and other evidence in the record." (*Id.*).

Plaintiff argues that his "long work history" "should . . . benefit him when applying for disability benefits." (Dkt. No. 12, at 12). "A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983). "Just as a good work history may be deemed probative of credibility, poor work history may prove probative as well." *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998). Plaintiff undoubtedly exhibited an excellent work ethic and remarkable 40-year career in secondary education, among other employments. The ALJ did not refer to Plaintiff's work history, beyond observing in the context of past relevant work, that Plaintiff performed the positions of secondary education teacher, justice, and coach "at a substantial gainful activity level, long enough to become proficient at them." (R. 24). Thus, it

appears the ALJ drew no inferences from Plaintiff's work history. "Work history, however, is but one of many factors to be utilized by the ALJ in determining credibility." *Marine v. Barnhart*, No. 00-cv-9392, 2003 WL 22434094, at *4, 2003 U.S. Dist. LEXIS 19082, at *10 (S.D.N.Y. Oct. 23, 2003). Further, given that the ALJ otherwise properly evaluated Plaintiff's subjective complaints, and her conclusion is support by substantial evidence, Plaintiff's argument is unavailing.

Plaintiff argues that the ALJ erred when, in the context of rejecting Plaintiff's subjective complaints, she noted that Plaintiff "received far less treatment than one would expect of someone experiencing pain and limitation of the severity he has reported." (R. 22). Plaintiff asserts that this finding is contradicted by his continuous treatment with Dr. Meny, cardiologists, and a podiatrist, and improper in light of his testimony regarding the financial burden of such care. (Dkt. No. 12, at 13). The Commissioner responds that, as the ALJ highlighted in her recitation of the medical evidence, "Plaintiff had not received any significant surgical intervention for cardiac impairment during the relevant time period," and thus her conclusion is well supported. (Dkt. No. 14, at 16). The Court agrees with the Commissioner.

Despite Plaintiff's reading to the contrary, the ALJ did not rely on any failure on Plaintiff's part, to seek or attend medical appointments, in finding that Plaintiff "received far less treatment than one would expect" of someone with a debilitating condition. (R. 22). Rather, the ALJ observed that during the nearly 20 years Plaintiff has had a cardiac condition, which she acknowledged was a severe impairment, the lack of "significant" test findings or "significant surgical intervention for a cardiac impairment," did not support a finding of a debilitating cardiac condition. (R. 21). Not only is the treatment a claimant received and appropriate factor to consider in evaluating subjective complaints, *see* 20 C.F.R. § 416.929(c)(3)(i)–(vii) (referring to

the "treatment the claimant receives" as a relevant factor), but there is substantial evidence in the record to support this finding. Repeated catheterizations have indicated that Plaintiff's LAD stenosis has been unchanged at 30% since 2005. (R. 262, 560, 618). Most physical findings have been minimal, including "increased S2/S3" and "bilateral edema," and otherwise normal. (R. 279, 287, 483). Further, even after the January 9, 2018, cardiac catheterization, which revealed increased disease, (*see* R. 680–81 (report noting "LAD 20–30% long mid vessel disease, [Left Circumflex Artery] 20% mid disease, R[ight] C[oronary] A[rtery] dominant with 20% proximal and distal disease, and E[jection] F[raction] 55–60%")), the "[p]lan was to "[c]ontinue medical therapy including statin and metroprolol." (R. 681). Thus, the ALJ's finding regarding the lack of evidence of surgical intervention is well supported and Plaintiff's argument that her failure to consider the financial burden of medical care is unavailing.

Plaintiff next argues that in evaluating his complaints, the ALJ failed to consider opinion evidence from his treating cardiologist, Dr. Ranjbara-Jahromi, and treating podiatrist, Dr. Schug. (Dkt. No. 12, at 14). In order to determine whether the ALJ erred in concluding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms are not entirely consistent with the evidence in the record, it is necessary to assess whether the ALJ properly considered the opinion evidence in determining the weight to which it was entitled.

The failure to consider a treating physician's opinion, or to do so properly, may be grounds for reversal. *See Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) (explaining that when evaluating the medical evidence in the record, "Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion"). In this case, however, neither Dr. Ranjbara-Jahromi nor Dr. Schug offered "medical opinions," as that term is

defined by the applicable regulations, *see* 20 C.F.R. § 404.1527 ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."); they provided medical evidence, on which the ALJ recounted and relied, (*see* R.21 (referring to Dr. Ranjbara-Jahromi's physical examinations and testing in connection with cardiac condition and Dr. Schug's examination of Plaintiff's feet and findings of "absent sensation" in feet)). To the extent Plaintiff argues that the ALJ erred in failing to consider Dr. Ranjbara-Jahromi's August 16, 2016, statement that "[i]t appears that [Plaintiff's] job was a major factor for his mental stress and his profile is improving," his argument is without merit as certain "findings—including the ultimate finding of whether a claimant is disabled and cannot work—are 'reserved to the Commissioner.'" *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (quoting 20 C.F.R. § 404.1527(e)(1)).

### 2.    Residual Functional Capacity

Plaintiff argues that the ALJ erred in her RFC determination because she "found Plaintiff to have a severe impairment of coronary artery disease, but did not offer any limitations resulting from that determination."[12] (Dkt. No. 12, at 15). In addition, Plaintiff challenges the ALJ's rejection of Dr. Cole's opinion that Plaintiff's cardiac condition was "severe to the point of restricting him from 'activities requiring mild or greater exertion because of his cardiac problems and history of heart attack.'" (*Id.* at 16 (quoting R. 609)).

---

[12] Plaintiff's arguments principally concern the ALJ's handling of his cardiac condition; he has not argued that his diabetes with neuropathy, which affects his feet and balance, or orthopedic issues, i.e., knee pain, were not accounted for in the RFC. Indeed, the ALJ determined that Plaintiff "must never climb ladders, ropes or scaffolds; and must avoid concentrated exposure to hazards such as dangerous machinery and unprotected heights." (R. 20).

"The RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations." *Klimek v. Colvin*, No. 15-cv-789, 2016 WL 5322022, at *9, 2016 U.S. Dist. LEXIS 129804 (N.D.N.Y. July 21, 2016), *report-recommendation adopted sub nom. Klimek v. Comm'r of Soc. Sec.*, 2016 WL 5256753, 2016 U.S. Dist. LEXIS 129491 (N.D.N.Y. Sept. 22, 2016). "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." *Roat v. Barnhart*, 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010) (quoting *Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)).

In assessing Plaintiff's RFC, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b),[13] "except must never climb ladders, ropes or scaffolds; and must avoid concentrated exposure to hazards such as dangerous machinery and unprotected heights." (R. 20). Plaintiff argues that the ALJ failed "to offer any limitations resulting from [the] determination" that Plaintiff has the severe impairment of coronary artery disease. (Dkt. No. 12, at 15). The ALJ, however, expressly considered Plaintiff's cardiac condition in formulating Plaintiff's RFC and determining his exertional limitations. (R. 21). Indeed, one reason the ALJ assigned "little weight" to Dr. Cole's opinion regarding limitations in lifting and carrying was that "additional evidence of record regarding treatment after Dr. Cole's review," including evidence concerning Plaintiff's "cardiac condition," "supports a finding of

---

[13] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

*further* limitation in lifting and carrying than those opined by Dr. Cole." (R. 23 (emphasis added)). Thus, Plaintiff's argument is without merit.

Plaintiff also takes issue with the ALJ's rejection as "vague," Dr. Cole's opinion that Plaintiff should be restricted from "activities requiring mild or greater exertion because of his cardiac history" and asserts the ALJ should have obtained "clarification regarding Dr. Cole's assessment." (Dkt. No. 12, at 16). As an initial matter, it is not legal error to reject an opinion as vague. *See Garretto v. Colvin*, 15-cv-8734, 2017 WL 1131906, at *21, 2017 U.S. Dist. LEXIS 44556, at*58 (S.D.N.Y. Mar. 27, 2017) ("[The consulting physician's] use of the word 'moderate' is vague and provides no support for the ALJ's conclusion that plaintiff engage in these activities for six hours out of an eight hour day."). Further, while the ALJ has a duty to develop the record, *see Parker v. Comm'r of Soc. Sec. Admin.*, No. 18-cv-3814, 2019 WL 4386050, at *5, 2019 U.S. Dist. LEXIS 156826, at *13 (S.D.N.Y. Sept. 13, 2019) ("An ALJ has an affirmative duty to develop the administrative record . . . even when the claimant is represented by counsel because social security disability hearings are non-adversarial." (citing *Moran*, 569 F.3d at 112–13)), there was no error here, where the ALJ's exertional findings are supported by substantial evidence. Plaintiff's treating physician Dr. Meny opined that Plaintiff was limited to lifting and carrying up to 10 pounds frequently, but not more than 20 pounds, (R. 623), these restrictions are consistent with an RFC for light work. *See* 20 C.F.R. § 202.1567(b). And although the ALJ rejected Dr. Meny's standing and walking restrictions, she did so on the ground that such findings "were not supported by [Dr. Meny's] own treatment notes and findings," which generally revealed normal heart rate and rhythm, no murmurs, no edema, the absence of jugular vein distension, normal motor strength, and normal gait and stance. (R. 23). The ALJ's conclusion regarding the relatively normal findings in the medical evidence is

supported by substantial evidence, as discussed above. The ALJ also found Dr. Meny's findings inconsistent with his own statements of "no physical disability," notation of Plaintiff's good exercise habits, and Plaintiff's activities of daily living. (R. 23–24). Indeed, Dr. Meny, in conducting a "DOT physical" on September 20, 2017, (R. 630)—four months after completing the medical source statement at issue, (R. 621)—found "[n]o physical disability and activities of daily living are normal." (R. 632). Plaintiff testified that he was able to shower and dress daily, prepare meals, clean and do laundry several times a week, shop with his wife, read, go to the movies, and drive. (R. 54–55, 60–65). Thus, the ALJ could properly conclude that Dr. Meny's opinion that Plaintiff was limited in his ability to sit, stand, or walk for more than one or two hours in an eight hour day, (R. 624), and limited in the use of his hands and feet, (R. 625), was not supported by the record as a whole. *See Pappas v. Saul*, 414 F. Supp. 3d 657, 677–78 (S.D.N.Y. 2019) (finding that "the ALJ could properly conclude that [doctor's] opinion that Pappas 'should limit activities involving moderate exertion and that the claimant is able to sit for 4 hours during an 8-hour workday, stand for 2 hours during an 8-hour workday, walk for 2 hours during an 8-hour workday,' was inconsistent with the record as a whole because the record evidence showed Pappas's ability to engage in certain routine daily activities was not significantly limited by any physical impairments, and there was no evidence that Pappas would not be able to perform light work with certain restrictions" (internal citation omitted)). Accordingly, the Court finds no legal error in the ALJ's determination of Plaintiff's RFC and that it is supported by substantial evidence.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: September 30, 2020
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge